# LEOPOLDSTADT, INC.,[1] & others[2] *vs.* COMMISSIONER OF THE DIVISION OF HEALTH CARE FINANCE & POLICY.

Suffolk. October 4, 2001. - February 11, 2002.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Nurse. Administrative Law,* Wage administration, Rate setting, Regulations.

The decision of the division of health care finance and policy to calculate industry-wide rates that temporary nursing agencies could charge to medical facilities for temporary nursing personnel was not properly within its discretion, and was not entitled to deference, where the division was required by G. L. c. 111, § 72Y, to calculate rates taking into consideration the reasonable administrative expenses of each temporary nursing agency pool, and the wages and benefits paid by each temporary nursing agency to the medical personnel supplied to a health care facility. [86-88]

Where the division of health care finance and policy failed to collect the data required by G. L. c. 118G, § 7, before setting final rates that temporary nursing agencies could charge to medical facilities for temporary nursing personnel, the regulations setting the rates were invalid. [88-89]

In setting rates that temporary nursing agencies could charge to medical facilities for temporary nursing personnel, the division of health care finance and policy's calculation of a "median profit factor" rather than a reasonable return on equity for each temporary nursing agency failed to satisfy the requirements of G. L. c. 118G, § 7, and G. L. c. 111, § 72Y, and therefore the regulations setting the rates were invalid. [89-90]

The decision of the division of health care finance and policy, as part of setting rates that temporary nursing agencies could charge to medical facilities for temporary nursing personnel, to interpret the phrase "wages and benefits allowed" in G. L. c. 118G, § 7, to refer to the wages and benefits that nursing homes paid to their permanent staff was a reasonable interpretation of the statute and one that accomplished the statute's purpose. [90-92]

In setting rates that temporary nursing agencies could charge to medical facilities for temporary nursing personnel, the requirement that the division of health care finance and policy consult with the department of public health was permissive rather than mandatory. [92]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on June 8, 2001.

---

[1] *Doing business as Favorite Nurses.*

[2] American Staffing Association (ASA) and the Massachusetts Association of Nursing Agencies (MANA).

The case was reported by *Greaney*, J.

*Daniel L. Goldberg* (*S. Elaine McChesney* with him) for the plaintiffs.

*Juliana deHaan Rice*, Assistant Attorney General, for the defendant.

CORDY, J. The plaintiffs, Leopoldstadt, Inc., doing business as Favorite Nurses; the American Staffing Association (ASA); and the Massachusetts Association of Nursing Agencies (MANA), all provide, or work with providers of, temporary nursing personnel to medical facilities.[3] These providers of temporary nursing personnel are referred to interchangeably as temporary nursing agencies (TNAs), or nursing pools. The plaintiffs filed a complaint in the county court seeking declaratory and injunctive relief regarding the Commonwealth's setting of the maximum hourly rates that TNAs are permitted to charge to medical facilities for temporary nursing personnel. A single justice of this court denied the plaintiffs' request for an injunction and reserved and reported the case to the full court.

The plaintiffs contend that (1) the wage cap component of G. L. c. 118G, § 7 (Section 7), and of the rate setting regulations, 114.3 Code Mass. Regs. §§ 45.00,[4] are invalid because the wage cap is either inapplicable or unconstitutional; and (2) the division of health care finance and policy (division) violated the procedural and substantive mandates of the enabling statutes in adopting the rate regulations by, among other things, failing to calculate the rates on an individualized basis; establishing final rates without collecting financial reports from all of the TNAs; calculating a "median profit factor" instead of a "reasonable return on equity"; interpreting the statutory phrase "wages and benefits allowed" to permanent nursing

---

[3]Favorite Nurses provides temporary nursing staff to nursing homes and hospitals. ASA is a professional association of temporary nursing staff agencies. MANA is a professional trade organization representing the interests of temporary nursing staff agencies.

[4]These regulations were adopted pursuant to G. L. c. 118G, § 7, and G. L. c. 111, § 72Y. General Laws c. 118G, § 7, enables the division of health care finance and policy (division) to determine rates of payment for various types of health care providers, including TNAs. General Laws c. 111, § 72Y, contains the specific requirements for the establishment of reasonable rates for services provided by TNAs.

personnel as "wages and benefits paid" to such personnel; and failing to consult with the Department of Public Health (department).

We conclude that the division did not adopt the challenged regulations in conformity with the requirements of the enabling statutes. Accordingly, we hold that they are invalid, and we order the division to establish interim rates as provided by Section 7 and to recalculate final rates in compliance with Section 7, G. L. c. 111, § 72Y (Section 72Y), and this opinion.

*Background.*

In 1988, in response to a perceived shortage of nurses and other health care workers in the Commonwealth, the Legislature enacted Section 72Y, which provided for the registration and regulation of TNAs. St. 1988, c. 164, § 128. The purpose of Section 72Y was to ensure an adequate and stable supply of nursing services for residents of licensed long-term care facilities by (1) discouraging staff from leaving permanent positions to take more flexible and higher-paying temporary jobs; and (2) ensuring that nursing homes did not pay excessive amounts for temporary staff, which would deplete funds necessary for resident care.

Pursuant to Section 72Y, the rate setting commission (commission)[5] promulgated 114.3 Code Mass. Regs. §§ 45.00 in November, 1988. The regulations set forth "the methodology for determination of reasonable rates of payment for services provided by [TNAs]" that were registered with the department, the methods by which each TNA could request rate changes, and the standards that the commission would use to approve or reject those requests. 114.3 Code Mass. Regs. §§ 45.01, 45.03 (1989).

Between 1992 and 2000, the supply of nurses was deemed to be sufficient to meet the demand, rate setting was suspended, and the market determined nursing pool rates. However, the division anticipated that "[i]f a severe nursing shortage develops, or if temporary nursing service prices to health care providers rise faster than reasonable in a competitive market,

---

[5]The rate setting commission was the predecessor agency of the division. The division was created in 1996. See St. 1996, c. 151, §§ 31, 275.

the Division will propose regulatory amendments to establish the methodology for determining reasonable rates of payment for services provided by temporary nursing services." 114.3 Code Mass. Regs. § 45.03 (1997).

On March 21, 2000, the division sent out a report to each of the 184 TNAs registered with the department, requesting administrative and financial information for the fiscal year ending December 31, 1999, including information about hours, revenue, administrative costs, and income (cost reports). The TNAs were required to complete and return the cost reports to the division by May 1, 2000. After extending the deadline for completion and return of these reports, the division received sixty-five completed cost reports. Approximately fifty TNAs did not return cost reports because they were no longer doing business in Massachusetts. Thus, of the approximately 134 registered TNAs still doing business in Massachusetts, the division obtained cost reports from less than one-half of them.

In May, 2000, the Massachusetts Extended Care Federation (Federation), an association representing the interests of nursing homes in Massachusetts, sued the division in the Superior Court seeking declaratory relief and an injunction ordering the division to set interim rates for TNAs. In their complaint, the plaintiffs asserted that market conditions and, in particular, low unemployment created staffing shortages for nursing homes. This made nursing homes more dependent on TNAs to maintain adequate staffing levels, which in turn caused the TNAs to raise the rates charged to nursing homes and increase the wages paid to temporary nursing personnel. On June 7, 2000, the motion judge allowed the Federation's motion for injunctive relief, ordering that:

> "[A] preliminary injunction issue enjoining [the] defendants from failing and refusing to forthwith issue interim rates for nursing pools, said rates to remain in effect until such time as cost reports requested of nursing pools by the defendants are complete and the defendants have exercised their authority under G. L. c. 111, § 72Y, and G. L. c. 118G, § 7, by establishing reasonable rates for services provided by nursing pools registered with the Department of Public Health, taking into consideration the factors outlined in these statutes."

The division did not appeal from this order, but adopted emergency regulations, 114.3 Code Mass. Regs. §§ 45.00 (2000), which froze the rates charged by nursing pools at the rates charged as of June 1, 2000.[6] On August 31, 2000, the division proposed amendments to the emergency regulation that set new rates for TNAs. On October 13, 2000, and January 29, 2001, the division held hearings relating to these proposed rate regulations.[7]

Section 7 and Section 72Y require that the division consider three factors in determining the hourly rates that TNAs can charge to health care facilities. First, the division must consider the wages and benefits that the TNA pays to the temporary nursing personnel that it supplies to health care facilities. Section 7 limits the wage and benefit component by requiring that "the portion of the rate attributable to wages and benefits shall not exceed the prevailing wages and benefits allowed for permanent medical personnel of the same type at such health care facilities." Second, the division must consider the reasonable administrative expenses that the TNA incurs. Third, the division must provide the TNA a reasonable return on equity.

In setting the wage and benefit component of the proposed rates, the division took the median hourly wages and benefits paid by nursing home facilities in 1999, and adjusted this figure upward by 6.67 per cent a year for inflation based on the general rate of inflation in the economy during the years 1999 and 2000.[8]

In setting the administrative component of the rate, the division calculated the 1999 median hourly administrative expense

---

[6]The division later amended the emergency regulation to freeze the rates as of June 23, 2000, which meant that no nursing pool could charge more than the amount it had charged for a service on June 23, 2000.

[7]See G. L. c. 30A, § 2 ("A public hearing is required prior to the adoption, amendment, or repeal of any regulation if [a] violation of the regulation is punishable by fine or imprisonment; or, [b] a public hearing is required by the enabling legislation of the agency or by any other law; or, [c] a public hearing is required as a matter of constitutional right"). Here, G. L. c. 118G, § 2, requires that the division "shall adopt and amend rules and regulations, in accordance with chapter thirty A . . . . . Such regulations shall be adopted, after notice and hearing. . . ."

[8]The division used the 6.67 per cent figure based on the updated Massachusetts Consumer Price Index optimistic forecast.

reported on the cost reports of the responding TNAs and added 6.67 per cent to that amount to account for inflation.

The division did not calculate the "reasonable return on equity" component. In its place, the division included in the rates an allowance that was the "median net income" as a percentage of net revenues of those TNAs that filed completed 1999 cost reports. Because more than one-third of the reporting TNAs that the division included in its calculation reported operating losses in 1999, this calculation resulted in a 4.14 per cent profit factor.

On February 16, 2001, the division adopted 114.3 Code Mass. Regs. §§ 45.00 (2001), as the final regulations, setting the hourly rates that TNAs could charge health care facilities. These rates took effect on March 2, 2001. The regulation provided that hourly rates charged by TNAs could not exceed the maximum rates set forth on the schedule in 114.3 Code Mass. Regs. § 45.03(3), which vary by geographic region.

*Analysis.*

The plaintiffs have raised, pursuant to G. L. c. 231A, a substantive challenge to a rate regulation of general applicability. See *Massachusetts State Pharm. Ass'n* v. *Rate Setting Comm'n*, 387 Mass. 122, 138-139 (1982). "In a declaratory judgment proceeding (see G. L. c. 30A, § 7, and G. L. c. 231A), a provider may maintain a direct judicial challenge to a general regulation, both on the ground that the general regulation was not validly adopted . . . and on the ground that the general regulation is substantively defective, that is, inadequate . . ." (citations omitted). *Id.* at 126.

"In any challenge to a regulation, the plaintiff has the burden of showing that the regulation is invalid or illegal." *Id.* "Where the plaintiff asserts that a regulation is illegal on the basis of particular facts, the factual showing must be made in the judicial proceeding itself." *Id.* "Thus, . . . a court reviewing a regulation is not concerned with whether there was substantial evidence in a record before the agency, but rather it must consider whether, based solely on the record made in court, the adoption of the agency regulation was illegal, arbitrary, or capricious." *Id.* Courts afford rate regulations the same deference that they extend to acts of the Legislature. *Id.* at 127.

Based on the record before this court, we conclude that the division did not comply with the plain language of Section 7 and Section 72Y when it adopted the new TNA rate regulations.

*Failure to calculate rates on an individual basis.* The plaintiffs contend that the division is required to calculate rates on an individual, TNA-by-TNA basis, as has historically occurred.[9] The division contends that its decision to calculate industry-wide rates is properly within its discretion, and that this decision is reasonable and rational, and therefore is entitled to deference.

The resolution of this issue requires a careful reading of the plain language of the relevant statute. Section 72Y uses both the singular and plural form of the word "pool" when referring to TNAs. For example, Section 72Y states that: "A person who operates *a nursing pool* shall register *the pool* with the commissioner [of public health]" (emphasis added). In addition, Section 72Y provides that the division "shall establish minimum standards for the registration and operation of *a nursing pool*" and that "[t]he regulations shall be designed to protect the public's right to high quality health care by assuring that *nursing pools* employ competent and qualified nursing personnel" (emphasis added). When Section 72Y describes the establishment of "reasonable rates of payment pursuant to this section for services provided by *nursing pools*," it requires the division to take into consideration "the reasonable administrative expenses of *such pool*, the wages and benefits paid by *the pool* to the medical personnel supplied to a health care facility and an allowance which shall provide a reasonable return on equity" (emphasis added).

The Legislature's affirmative use of the singular form is not insignificant. See *Blue Cross of Mass., Inc.* v. *Commissioner of Ins.*, 397 Mass. 674, 678 (1986). "While we have, on occasion,

---

[9] The plaintiffs incorrectly assert that the division is required to abide by past agency interpretations of the relevant statutes. The rule that the plaintiffs cite concerns the interpretation of ambiguous statutes. See *Connery* v. *Commissioner of Correction*, 414 Mass. 1009, 1010 (1993), quoting *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 343 (1964) ("Significance in [statutory] interpretation may be given to a *consistent*, long continued administrative application of an ambiguous statute . . . especially if the interpretation is contemporaneous with the enactment").

interpreted singular forms to include the plural, or vice versa . . . the interpretation of the plural form to include the singular has been to assure that the purpose of the statute may be fulfilled." *Id.* at 678-679, citing *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 49-50 (1975), and G. L. c. 4, § 6, Fourth ("Words importing the singular number may extend and be applied to several persons or things, words importing the plural number may include the singular . . . ."). "However, 'this rule is not one to be applied except where it is necessary to carry out the evident intent of the statute.' " *Blue Cross of Mass., Inc.* v. *Commissioner of Ins., supra* at 679, quoting *First Nat'l Bank* v. *Missouri*, 263 U.S. 640, 657 (1924).

Here, the purposes of Section 72Y were to ensure (1) an adequate supply of nursing services for residents at licensed long-term care facilities; (2) that TNAs employ competent and qualified nursing personnel; and (3) that nursing personnel are provided to health care facilities in a way that will meet the needs of patients. The division acknowledges that between twenty and twenty-five per cent of the TNAs will need to reduce their prices to comply with the proposed maximum rates, and that TNAs will take in $1,400,000 less revenue as a result of the new rates. The record demonstrates that capping the hourly rates that TNAs can charge without consideration of individualized costs will, in some cases, decrease their ability to attract temporary nursing personnel,[10] and in other cases, make it difficult for them to continue in business.[11]

We decline to interpret the Legislature's use of the singular form of "pool" to include the plural because that interpretation does not assure that the purpose of the statute will be fulfilled. See *Blue Cross of Mass., Inc.* v. *Commissioner of Ins., supra* at 678-679. Rather, the evidence demonstrates that use of the

[10]At the January 29, 2001, public hearing before the division, one member of MANA offered: "The proposed regulations for temporary nursing services [are] detrimental to the Division's intent to ensure that the current supply of temporary nursing staff in the Commonwealth is to remain adequate and consistent with current supplies. The proposed regulation would force nurses to accept reduced pay rates and drive them away from the industry."

[11]At the same public hearing, the president of MANA testified: "[R]ight now we're at a very pivotal time in our industry. You people literally have, your decisions will impact whether nursing agencies remain in business as viable businesses or go away in the state of Massachusetts."

plural form of "pool" would defeat at least some of the statutory purposes listed above. We therefore conclude that the plain language of Section 72Y requires the division to calculate TNA rates taking into consideration the "reasonable administrative expenses of [each] pool," and the "wages and benefits paid by [each TNA] to the medical personnel supplied to a health care facility."[12]

*Cost reports.* The division failed to collect the data required by Section 7 before setting the final rates. Section 7 requires:

> "The division shall establish procedures whereby nursing pools shall submit accountable cost reports, which may be subject to audit, to the division for the purpose of establishing such rates. The division shall establish interim rates for nursing pools until such time as said reports are complete."

The regulations require TNAs to provide information to the division and allow the division to levy fines against TNAs that do not comply with the division's requests. See 114.3 Code Mass. Regs. § 45.06 (2001). See also 114.3 Code Mass. Regs. § 45.05(1) (1997).

On March 21, 2000, the division sent cost reports to each of the 184 registered nursing pools. The division received cost reports back from less than one-half of the TNAs that were still operating in Massachusetts. Although the division now asserts that it received sufficient data from which to make meaningful calculations, it is undisputed that the division did not have a complete set of cost reports as envisioned by Section 7 before it established the final rates.

The division had the ability to compel the TNAs to make their records available for inspection, to audit information supplied by a particular TNA, or to impose a fine on a TNA for failure to provide information. See 114.3 Code Mass. Regs. § 45.06 (2001). In spite of these enforcement mechanisms, the record is devoid of any evidence that the division attempted to obtain the necessary information beyond sending the cost report forms to the TNAs.

The division did not have the authority, pursuant to Section 7,

---

[12]The reasonable return on equity component is discussed separately.

to calculate final rates until it had completed its collection of cost reports from the TNAs. In addition to failing to comply with this explicit statutory mandate, the division admitted that the lack of cost reports prevented any determination of a reasonable return on equity, another mandatory component of the rate setting process.

*Reasonable return on equity.* The division failed to calculate a reasonable return on equity for each TNA as required by Section 7 and Section 72Y. A "return on equity" is a technical phrase that "shall be construed and understood according to such meaning." G. L. c. 4, § 6, Third.

We have discussed the importance of a fair rate of return to investors in a number of regulated industries. "Confiscation occurs when the Department's ratemaking decision deprives a utility of the opportunity to realize a fair and reasonable return on its investment." *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 10 (1978). "Rates for service provided by a regulated public utility must allow a fair rate of return to investors on the value of the property used in providing those services." *Hingham* v. *Department of Telecommunications & Energy*, 433 Mass. 198, 205 (2001), and cases cited. "A return is fair and reasonable if it covers utility operating expenses, debt service, and dividends, if it compensates investors for the risks of investment, and if it is sufficient to attract capital and assure confidence in the enterprise's financial integrity." *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 371 Mass. 881, 884 (1977). The return on equity "should be commensurate with returns on investments in other enterprises having corresponding risks." *Attorney Gen.* v. *Department of Pub. Utils.*, 392 Mass. 262, 266 (1984), quoting *FPC* v. *Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944).

There are a number of ways to measure a company's profitability, all of which measure different aspects of a company's performance.[13] A return on equity measures profitability by

---

[13]For example, a company's "profit margin" measures the portion of each sales dollar that is profit of the business. A "return on assets" measures the profit generated per dollar of assets invested in the business. The "payout ratio" measures the extent to which current earnings are distributed as

calculating the rate of return that stockholders are earning.[14] See C.H. Meyer, Accounting and Finance for Lawyers 334-337 (1995). A return on equity is calculated as a fraction, the numerator being net income minus preferred stock dividends, and the denominator being the average common stockholders' equity. *Id.* The division did not perform this calculation. Rather, the division calculated a "median profit factor," which it arrived at by calculating the median net income as a percentage of the net revenues reported by the TNAs that filed cost reports.

Calculating a business's return on equity is not the same as calculating a business's "profit factor." Although neither the United States Constitution nor the Massachusetts Constitution requires the use of a particular "theory or method of return computation," *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils., supra* at 884 n.5, here the Legislature selected a specific method for calculating the TNAs' profitability. An agency is not free to substitute its own method of calculating profitability for the specific method selected by the Legislature.

The division does not contend that it calculated a reasonable return on equity, but rather, that it calculated a "median profit factor" in lieu of a return on equity. At the January 29, 2001, hearing, a senior policy analyst for the division explained why the division did not calculate a reasonable return on equity: "We do not have balance sheet data from the nursing pools, so we are unable to calculate at this time an equity amount for each [temporary nursing] agency." The division blames this deficiency on the TNAs, contending that it is the result of the TNAs' failure to return their cost reports. This does not excuse the division's failure to comply with its statutory mandate.[15]

*Wage cap provision.* The plaintiffs contend that the "wage cap" provision in Section 7 is unenforceable because its

---

dividends or are reinvested in the business. The "dividend yield" is a measure of the profit that is actually received by stockholders in cash in relation to the value of their stock. C.H. Meyer, Accounting and Finance for Lawyers 334-337 (1995).

[14]This calculation includes the positive and negative effects of the company's use of debt in its capital structure. See C.H. Meyer, Accounting and Finance for Lawyers, *supra.*

[15]We need not decide whether the "median profit factor" was confiscatory.

language no longer has the same meaning as it had when the statute was adopted. This provision states:

> "In establishing rates for nursing pools pursuant to [G. L. c. 111, § 72Y], the division shall take into consideration wages and benefits paid by the pool to the medical personnel supplied to a health care facility and *that portion of the rate attributable to wages and benefits shall not exceed the prevailing wages and benefits allowed for permanent medical personnel of the same type at such health care facilities*"

(emphasis added). At the time that Section 7 was enacted in 1989, governmental reimbursement regulations for health care facilities set specific maximum reimbursement amounts for the wages and benefits paid by health care facilities to their medical personnel. See 114.2 Code Mass. Regs. § 2.08 (1989). The plaintiffs argue, however, that when the challenged regulations were adopted, those maximum wage and benefit reimbursement amounts were no longer identifiable as the result of changes to State regulation and Federal Medicaid laws. Thus, the term "wages and benefits allowed" has been rendered obsolete.

The division responds that Section 7 does not require it to look to an external source of payments to give meaning to the term "wages and benefits allowed." Rather, the division interprets this phrase to refer to the wages and benefits that the nursing homes pay to their permanent staff.

"In general, we grant substantial deference to an interpretation of a statute by the administrative agency charged with its administration." *Protective Life Ins. Co.* v. *Sullivan*, 425 Mass. 615, 618 (1997). "But this principle is one of deference, not abdication, and we have overruled an agency's interpretation when it is contrary to the plain language of the statute and its underlying purpose." *Id.* In addition, an agency's interpretation has been overruled when it is shown to be arbitrary or capricious, see *Tarin* v. *Commissioner of the Div. of Med. Assistance*, 424 Mass. 743, 750-751 (1997); when it is one supported by "no grounds which 'reasonable men might deem proper' to support it," *T.D.J. Dev. Corp.* v. *Conservation Comm'n of N. Andover*, 36 Mass. App. Ct. 124, 128 (1994), quoting *Cotter* v. *Chelsea*, 329 Mass. 314, 318 (1952); when it is devoid "of any

conceivable ground upon which [the action] may be upheld," *American Grain Prods. Processing Inst.* v. *Department of Pub. Health,* 392 Mass. 309, 329 (1984), quoting *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 776 (1980); or is impossible "by any reasonable construction [to] be interpreted in harmony with the legislative mandate," *Borden, Inc.* v. *Commissioner of Pub. Health,* 388 Mass. 707, 723, cert. denied, 464 U.S. 936 (1983), quoting *American Family Life Assur. Co.* v. *Commissioner of Ins.,* 388 Mass. 468, 477, cert. denied, 464 U.S. 850 (1983).

In the instant case, the Legislature intended to limit the amount that nursing pools pay temporary nurses by referencing the wages and benefits "allowed" for permanent medical personnel. The evident purpose was to establish wage and benefit parity between temporary and permanent nursing staff, such that the TNAs could not lure permanent staff away by offering substantially higher wages and benefits. The division's decision to quantify this limitation by the wages and benefits "paid" to such personnel is a reasonable interpretation of the statute and one that accomplishes its purpose. Even if, as the plaintiffs assert, the word "allowed" has no meaning as the result of Federal and State changes to Medicaid regulations, "[i]t is the function of the court to construe a statute as written and an event or contingency for which no provision is made does not justify judicial legislation." *Prudential Ins. Co. of Am.* v. *Boston,* 369 Mass. 542, 547 (1976). Thus, we conclude that the division's substitution of the word "paid" for the word "allowed" is a reasonable interpretation of Section 7.

*Consultation with the department.* Section 72Y states that the division, "by regulation, and in cooperation with the department of public health, shall establish reasonable rates of payment." The plaintiffs contend that the division failed to comply with this statutory provision when it established the rate regulations at issue here. The division contends that it "consulted" with the department to obtain the lists of TNAs registered in the Commonwealth. In this context, consultation with the department is permissive rather than mandatory. See *Boston* v. *Quincy Mkt. Cold Storage & Warehouse Co.,* 312 Mass. 638, 646-647 (1942). Thus, the division did not fail to comply with this provision of Section 72Y.

*Conclusion.*

The division failed to comply with the plain language of Section 7 and Section 72Y in three ways: (1) by failing to calculate the final rates taking into consideration the "reasonable administrative expenses of [each] pool" and the "wages and benefits paid by [each TNA] to the medical personnel supplied to a health care facility"; (2) by failing to collect all or substantially all of the cost reports before establishing final rates; and (3) by calculating a "median profit factor" in lieu of a "reasonable return on equity."

The case is remanded to the county court. A judgment is to be entered declaring 114 Code Mass. Regs. § 45.03 invalid and directing the division to establish interim rates as provided by G. L. c. 118G, § 7, and to recalculate final rates in compliance with G. L. c. 118G, § 7, and G. L. c. 111, § 72Y, consistent with this opinion.

*So ordered.*