476             444 Mass. 476 (2005)

City of Salem *v.* Bureau of Special Education Appeals of the Department of Education.

CITY OF SALEM *vs.* BUREAU OF SPECIAL EDUCATION APPEALS OF THE DEPARTMENT OF EDUCATION & another.[1]

Essex. May 2, 2005. - June 16, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Education,* Special educational needs. *School and School Committee,* Special education. *Administrative Law,* Regulations, Agency's interpretation of regulation, Agency's authority.

Overview of the pertinent statutory provisions and regulations governing the provision of special education in the Commonwealth. [479-481]
In an action brought to determine whether the two municipalities (the city of Salem and the town of Georgetown) in which the divorced parents of a child separately lived should share financial responsibility for providing special educational services to the child, this court concluded that the regulations of the Department of Education assigning, in such circumstances, the cost of special education services equally to the two school districts, were reasonable and valid and did not contravene G. L. c. 71B, §§ 3 and 5 [481-483]; further, this court concluded that G. L. c. 71B, § 5, did not prohibit the retroactive imposition on the city of Salem (city) of programmatic and fiscal responsibility for the child's special education and related services prior to the date on which the city was notified that the child's mother had moved there [483-485]; further, the city waived its ability to argue that the imposition of such responsibility contravened 603 Code Mass. Regs. § 28.06(2)(e)(1), where it failed to raise the issue below [485-486].

CIVIL ACTION commenced in the Superior Court Department on May 3, 2002.

The case was heard by *Robert H. Bohn,* J., on motions for judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*James G. Gilbert,* City Solicitor, for the plaintiff.

*Jane L. Willoughby,* Assistant Attorney General, for Bureau of Special Education Appeals of the Department of Education.

---

[1]Town of Georgetown.

*Kay H. Hodge* (*Nancy N. Nevils* with her) for town of Georgetown.

GREANEY, J. We transferred this case here on our motion to decide whether the two municipalities in which the divorced parents of a child separately live (the city of Salem and the. town of Georgetown) should share financial responsibility for providing special educational services to the child, where the child is in the custody of the Department of Social Services (DSS), and is living and receiving services at a private residential school in Lenox. We conclude that the regulations of the Department of Education (department), assigning, in these circumstances, the cost of special education services equally to the two school districts in which the child's divorced parents separately live, were reasonable and valid. We also conclude that Salem was responsible for providing special educational and related services to the child prior to the date on which the city was notified that the child's mother had moved there. Accordingly, we affirm the judgment.

The background of the case is as follows. The child, born in 1985, has a "disability" as defined under G. L. c. 71B, § 1, and 20 U.S.C. § 1401(3) (2000). See 603 Code Mass. Regs. § 28.02 (2001).[2] In 1993, in connection with divorce proceedings, the child's parents executed a stipulation in the Probate and Family Court agreeing that they would have joint legal custody of the child and that the father would have sole physical custody of the child subject to reasonable visitation by the mother. In January, 1997, the parents voluntarily placed the child in DSS custody to secure an out-of-home placement for him. In August of that year, the parents obtained a judgment of divorce nisi under which the voluntary placement agreement remained in force.

In early 1999, DSS petitioned the Probate and Family Court, pursuant to G. L. c. 119, § 23 (C), for an order placing the child in its care and custody. A DSS social worker cited a deterioration in the child's behavior and the need to secure the

---

[2]We refer to the Code of Massachusetts Regulations in effect in January, 2001. The Department of Education (department) has since adopted amendments, effective July 1, 2005, to the regulations that pertain to the issue before us. The amendments, however, do not apply to this case.

child's safety "as well as the safety of others around him," noting that the parents, who supported the petition, had been involved and cooperative but could not alone "provide a safe environment or appropriate treatment" for the child. On July 14, 1999, a probate judge allowed the petition and the child since has been in the care and custody of DSS.

At all relevant times, the father has lived in Georgetown (in the marital home). Since January, 1997, the mother has lived outside the marital home in different municipalities, including the city of Beverly from May 6, 1998, to July 14, 1999, and thereafter, to the present, in Salem. For some time, the child had been living in Georgetown and, pursuant to an individual education plan (IEP)[3] written by Georgetown public schools, was assigned an "out-of-district" placement[4] at an approved school that he attended as a day student. In January, 1997, DSS arranged and paid for him to reside at the "out-of-district" school he had been attending. On September 7, 1999, and continuing to the present, DSS arranged for the child to reside at a different "out-of-district" program, an approved private residential school in Lenox.[5] DSS has paid, and continues to pay, the residential costs for the child's placement.

In July, 2000, the DSS social worker sought a determination

---

[3]An individual education plan (IEP) is "a written statement, developed and approved in accordance with federal special education law in a form established by the Department that identifies a student's special education needs and describes the services a school district shall provide to meet those needs." 603 Code Mass. Regs. § 28.02 (2001).

[4]In general, a student's special educational needs may be fulfilled in either an "[i]n-district [p]rogram," one "operated in a public school building or other facility that provides educational services to students of comparable age, with and without disabilities," or an "out-of-district [p]rogram," namely, one "located in a building or facility outside the general education environment that provides educational services primarily to students with disabilities and shall include all programs approved under 603 [Code Mass. Regs. §] 28.09." 603 Code Mass. Regs. § 28.02. An out-of-district program "may be operated by a private organization or individual, a public school district, or a collaborative." *Id.* Designation of the appropriate program is primarily based on the student's IEP. See 603 Code Mass. Regs. § 28.06(2)(a).

[5]An "[a]pproved [p]rivate [s]pecial [e]ducation [s]chool" or "[a]pproved [p]rogram" is "a private day or residential school, within or outside Massachusetts, that has applied to, and received approval from, the Department according to the requirements specified in 603 [Code Mass. Regs. §] 28.09." 603 Code Mass. Regs. § 28.02.

from the department on which school district was responsible for the child's placement. The department decided that Georgetown was solely "programmatically and fiscally responsible."[6] Georgetown sought review of the decision before the bureau of special education appeals (bureau). See 603 Code Mass. Regs. § 28.08(3).

Before the bureau, the department changed its position because it had not taken into account that the child had been and remained in DSS custody. The department concluded that, in these circumstances, its regulations provided that the school districts in which both the father and mother lived would jointly share programmatic and fiscal responsibility for the child's special education and related services. After a hearing, the bureau entered a decision agreeing with the department's new position. The bureau also concluded that, despite a lack of notice to Salem, Salem had joint *programmatic* responsibility with Georgetown for the child's special education and related services from September 7, 1999, through June 30, 2000, and that Salem had joint *programmatic and fiscal* responsibility with Georgetown for the child's special education and related services from July 1, 2000, through the present.[7]

Salem sought review of the bureau's decision pursuant to G. L. c. 30A, § 14. On their cross motions for judgment on the pleadings, a Superior Court judge denied Salem's motion, agreeing with the conclusions made by the bureau, and granted Georgetown's motion. Judgment entered in favor of Georgetown, and Salem appealed.

1. An overview of the pertinent statutory provisions and regulations is in order. The case involves G. L. c. 71B, which governs the provision of special education in the Commonwealth. In general terms, the statute "requires every

[6]The term "programmatic responsibility" includes responsibility for establishing a special education program specifically tailored to meet the unique needs of a child, evaluating a child's progress in the program, monitoring the effectiveness of the child's placement, and reevaluating the child's needs. See G. L. c. 71B, §§ 3, 5.

[7]The bureau also concluded that from September 7, 1999, through June 30, 2000, *fiscal* responsibility for the child's special education and related services lay jointly with Georgetown and Beverly. Beverly did not seek further review of this determination.

city, town or school district: (1) to identify the school age children residing in that district who have special needs; (2) to diagnose and evaluate the educational needs of such children; (3) to propose a special education program to meet those needs; and (4) to provide or to arrange for the provision of such special education programs." *Northbridge* v. *Natick,* 394 Mass. 70, 72 (1985). See G. L. c. 71B, § 3. The statute also confers authority to the department, together with other State agencies or entities, to regulate special education programs and services. See G. L. c. 71B, §§ 2, 3, 10, 12. Read together, §§ 3 and 5 of G. L. c. 71B concern the assignment of financial responsibility for providing special education and related services. Section 3 provides, in pertinent part:

> "In accordance with the regulations, guidelines and directives of the department issued jointly with the departments of mental health, mental retardation, public health, youth services, and the commission for the blind and the commission for the deaf and hard of hearing and with assistance of the department, the school committee of every city, town or school district shall identify the school age children *residing therein* who have a disability . . . [and] provide or arrange for the provision of [a] special education program [for such children]" (emphasis added).

Section 5 provides, in pertinent part:

> "Any school committee which provides or arranges for the provision of special education pursuant to the provisions of section three shall pay for such special education personnel, materials and equipment, tuition, room and board, transportation, rent and consultant services as are necessary for the provision of special education . . . ."

The department's regulations also speak to the assignment of financial responsibility for providing special education and related services. Section 10.07(1) of 603 Code Mass. Regs. provides:

> "Each school district shall pay for the special education and related services specified in the approved individual education plan for every student in need of special educa-

444 Mass. 476 (2005) 481

City of Salem *v.* Bureau of Special Education Appeals of the Department of Education.

tion for whom the district is assigned financial responsibility under 603 [Code Mass. Regs. §§] 28.00."

Section 28.03(4)(b) of 603 Code Mass. Regs. states:

"The parent's school district shall have both programmatic and financial responsibility when . . . eligible students require an out of district placement and such students live and receive special education services at approved special education residential schools."

The regulations define the term "[p]arent's [s]chool [d]istrict," in pertinent part, as follows:

"[I]f the eligible student is in the care or custody of the Department of Social Services or other state agency, the *parent's school district* shall be the district(s) where the parent(s) are living or were last known to be living without regard to the parent's custody status" (emphasis in original).

603 Code Mass. Regs. § 28.02.

2. We reject Salem's argument that the department's regulations contravene G. L. c. 71B, §§ 3 and 5. "An administrative agency has jurisdiction to establish regulations that bear a rational relation to the statutory purpose." *Globe Newspaper Co.* v. *Beacon Hill Architectural Comm'n*, 421 Mass. 570, 583 (1996), and cases cited. "An agency's construction of its own regulation . . . is one to which considerable deference is due." *Northbridge* v. *Natick, supra* at 74. A regulation cannot be declared void unless its provisions "cannot by any reasonable construction be interpreted in harmony with the legislative mandate . . . and enforcement of such regulations should be refused only if they are plainly in excess of legislative power" (citation omitted). *Berrios* v. *Department of Pub. Welfare*, 411 Mass. 587, 595-596 (1992).

The plain language of §§ 3 and 5 of G. L. c. 71B has been construed as "clearly imposing the burden of paying for a special education program on the municipality (or school district) where the child needing the program *resides*" (emphasis in original). *George H. & Irene L. Walker Home for Children,*

*Inc.* v. *Franklin*, 416 Mass. 291, 295 (1993) (*Walker*). See *Boston* v. *Board of Educ.*, 392 Mass. 788, 792-793 (1984). While the residence of a child is typically the same as that of the parent who has physical custody of the child, see *Walker, supra*, the phrase "residing therein" in G. L. c. 71B, § 3, "is not so obviously self-defining when considerations such as split families, guardianships, children living with foster parents, relatives or friends, and institutionalized children enter the picture," *Board of Educ.* v. *School Comm. of Amesbury*, 16 Mass. App. Ct. 508, 512 (1983). While recognizing this reality, we said in *Walker, supra* at 296, that "[u]nder the terms of § 3, the department has been given the authority to adopt regulations addressed to resolving the issue of residence in situations in which a child's legal residence may be in some doubt." Clearly, that type of situation is present here — the child has no custodial parent because he is in DSS custody, and it is settled that the child's residence cannot be based on the municipality in which he lives because he lives at a residential school, see *Walker, supra* at 296 n.8 (rejecting contention that students resided in municipalities in which their residential special education schools were located); *Board of Educ.* v. *School Comm. of Amesbury, supra* at 516-517 (noting that "it would impose an unbearable burden on communities which are hosts to institutions for handicapped children if they became liable for the special needs education of all the children enrolled in them" [footnote omitted]). As such, we conclude that the department's regulations constitute a proper exercise of the department's authority and are not contrary to §§ 3 and 5 of G. L. c. 71B, because the regulations appropriately address a situation to which the statutory provisions do not speak.

The regulations provide a reasonable means of assigning financial responsibility for the child's special education and related services when the child is in DSS custody and resides at his out-of-district placement. Allocating the burden between Georgetown and Salem, the municipalities in which the child's divorced parents live, ensures, consistent with the primary purpose of G. L. c. 71B, that the child receives appropriate special education and related services, see, e.g., St. 1972, c. 766, § 1, and does not overburden one municipality (Georgetown),

in which the child no longer resides, with the extraordinary costs usually associated with an out-of-district placement. The Superior Court judge correctly noted that, in cases where neither parent has physical custody, "[i]t would be less reasonable for [the department] to arbitrarily select one parent's municipality to bear the entire education burden of a student in the custody of DSS." That other approaches to the issue may exist does not invalidate the approach adopted by the department where that approach bears "a rational relation to the statutory purpose," *Globe Newspaper Co.* v. *Beacon Hill Architectural Comm'n, supra,* and where Salem has not satisfied its burden of showing that the regulation is invalid or illegal, see *Leopoldstadt, Inc.* v. *Commissioner of the Div. of Health Care Fin. & Policy,* 436 Mass. 80, 85 (2002).

Our decision in the *Walker* case does not require a different result. There we considered which school district should pay the costs of special education programs for two brothers who each needed a special education program at a residential school and lived with their mother (who had been awarded physical custody of them) in the town of Milford. *Walker, supra* at 292. Milford sought a determination that the town of Franklin, where the boys' father lived (but where neither boy had ever lived or attended school), pay one-half of the costs. *Id.* at 292-293. While we concluded that the school district responsibility for a child's special education services turns on where the child resides (Milford in the *Walker* case, see *id.* at 297), the mother in the *Walker* case at all times retained physical custody of the boys (in Milford), unlike the situation presented (with the child in DSS custody). The *Walker* case is distinguishable and cannot be read to be instructive when a child is in DSS custody and lives at his out-of-district residential school.

3. Salem contends that the bureau's retroactive imposition on it of programmatic and fiscal responsibility for the child's special education and related services violates the second paragraph of G. L. c. 71B, § 5, known as the "move-in law."[8]

[8]General Laws c. 71B, § 5, provides, in relevant part:

"Any school committee which provides or arranges for the provision of special education pursuant to the provisions of section three shall pay for such special education . . . .

More particularly, Salem maintains that it was not aware until November, 2001, that the child's mother had moved to Salem, and that for it to be charged with responsibility for the child's services before that time, without notice, contravenes the "move-in law." We do not agree.

The "move-in law" provides an exception to the general rule of assigning responsibility to a school district or municipality based on the municipality in which the parents (in this case) currently live. See G. L. c. 71B, § 5. In relevant part, the law provides that when a child or parent moves to a different school district on or after July 1 of any fiscal year, the "new" school district becomes immediately programmatically responsible for the special education and related services for the child, but the "old" school district remains financially responsible until the end of the fiscal year in which the move occurred. *Id.*

We reject Salem's arguments (as did the bureau and the Superior Court judge) because the move-in law does not expressly or implicitly contain a notice provision requiring that

"[I]f a child with a disability for whom a school committee currently provides or arranges for the provision of special education in an approved private day or residential school placement . . . or his *parent* or guardian moves to a different school district on or after July 1 of any fiscal year, such school committee of the former community of residence shall pay the approved budgeted costs, including necessary transportation costs, of such day or residential placement . . . of such child for the balance of such fiscal year; provided, however, that if such move occurs between April 1 and June 30, such school committee of the former community of residence shall pay such costs for the balance of the fiscal year in which the move occurred as well as for the subsequent fiscal year. The school committee of the new community of residence shall assume all responsibilities for reviewing the child's progress, monitoring the effectiveness of the placement, and reevaluating the child's needs from the date of new residence; provided, however, that during the period when the financial obligation of the former community of residence for such day or residential placement continues pursuant to this section, the school committee of such new community of residence shall provide the school committee of the former community of residence with notice of any such review, monitoring, and reevaluation, and an opportunity to participate; and provided, further, that the school committee of such new community of residence shall be financially responsive for any increase, and the obligation of the school committee of such former community of residence shall be reduced by any decrease, in the costs of such day or residential placement during such period which results from any such review, monitoring or reevaluation."

a new school district be notified that a parent (or student) has moved into its community prior to incurring fiscal responsibility for a student's special education and related services. The Legislature could have included such a notice provision if it had intended one to apply, because it specifically included in the move-in law a requirement that the new school district notify the former school district (where the former school district retains fiscal responsibility for services) of any meetings concerning the review, monitoring, or reevaluation of a child's special education services. See *id.* "[I]f specific language appears in one section of a statute and is absent from a related section, the absent language should not be read into the provision from which it is missing." *Tilcon Mass., Inc.* v. *Commissioner of Revenue,* 30 Mass. App. Ct. 264, 269 (1991), and cases cited.

While cognizant of the resulting budgetary issues faced by municipalities in light of our conclusion, the present situation appears to be an unusual one, and it appears that in most situations in which the move-in law applies, the new school district does receive notice of its obligations because the student moves into, and is physically present in, the new district. Salem oversimplifies the action it wants us to take, failing to appreciate that subsumed in the issue are matters requiring determinations such as who would be obligated to provide the notice, the manner of providing the notice, the form of the notice, the timetable for providing the notice, and the consequences for failing to provide notice. These determinations, as the initial notice issue itself, must fit practically within a highly regulated field and, as such, are more appropriately left for legislative action and consideration. It is not appropriate for us to amend the statute. See *Commissioner of Revenue* v. *Cargill, Inc.,* 429 Mass. 79, 82 (1999).

Finally, Salem's argument that the bureau's retroactive imposition of programmatic and fiscal responsibility on it contravenes a specific department regulation, 603 Code Mass. Regs. § 28.06(2)(e)(1),[9] was not raised below and, therefore,

---

[9]The regulation provides:

"*Placement Meeting.* Upon developing the IEP, if the needs of the student and the services identified by the Team are complex, and the

has been waived. See *Albert* v. *Municipal Court of Boston,* 388 Mass. 491, 493-494 (1983), and cases cited. We add, however, that the regulation has nothing to do with the imposition of *fiscal* responsibility on a municipality, the essential issue here (Salem does not argue that a different placement should have been made for the child). We further note that while the record reflects team meetings held on April 7, 1999, May 3, 1999, and October 18, 1999, no "Special Education Meeting Record" exists therein concerning the October 18, 1999, meeting to identify those present, and there is no indication whether these meetings were the only ones held during the pertinent time frame. Contrary to Salem's suggestion that the Superior Court judge should have discovered this regulation on his own, it was Salem's responsibility to both raise the issue and develop a complete record on which the issue could be properly evaluated.

*Judgment affirmed.*

---

Team is considering an initial placement out-of-district or a different setting for a student who has been served in an out-of-district program, the school district may schedule a separate Team meeting to determine placement. The placement meeting shall meet the participant requirements of federal special education law . . . and shall be held within ten school days following the meeting at which the Team developed the IEP. At the request of the parent, the placement meeting may be held at a later date.

"1. Any other school district that may be financially or programmatically responsible for the student shall be invited to participate in the placement meeting and shall receive notice of such meeting at least five school days prior to the meeting. The Department or other state agency involved with the student may designate a representative to participate in the placement meeting."

603 Code Mass. Regs. § 28.06(2)(e)(1).