RUTHLYN COMMODORE *vs.* GENESIS HEALTH VENTURES, INC.,[1]
& another.[2]

No. 03-P-1623.

Suffolk. November 10, 2004. - March 2, 2005.

Present: BECK, GELINAS, & KAFKER, JJ.

Further appellate review granted, 445 Mass. 1101 (2005).

*Anti-Discrimination Law,* Termination of employment. *Nursing Home. Depart-
ment of Public Health. Contract,* Employment. *Health Care Facility. Public
Health,* Health care facility. *Joint and Several Obligation.*

In an action for unlawful employment termination brought by a high-level
employee against the owner and licensee of a nursing home as well as the
independent company with which the nursing home owner contracted to
provide health care services at that facility, the judge erred in granting
summary judgment to the defendant nursing home owner on the plaintiff's
employment discrimination claim under G. L. c. 151B, where a genuine is-
sue of material fact existed as to the nursing home owner's status as a joint
employer with the health care services provider, given the nursing home
owner's contract rights, the ambiguities in the contract, the nondelegable
responsibilities set by the relevant Department of Public Health regulation,
the gaps in the record, and the fact-sensitive nature of the joint employer
determination [61-65]; further, this court remanded for consideration on a
fuller record the issue whether the plaintiff's equal rights claim under G. L.
c. 93, § 102, was barred by the G. L. c. 151B claim [65].
This court concluded that the definition of health care facility set out in G. L.
c. 149, § 187(*a*), encompassed the licensee of a health care facility for
purposes of determining violations of G. L. c. 149, § 187(*b*), the health
care whistleblower statute (whistleblower statute) [65-67], and that the
requirement that the licensee be jointly and severally responsible for the
direction of personnel and the establishment of policies, practices, and
procedures that encourage good patient or resident care, included oversight
responsibility for violations of the whistleblower statute and was nondeleg-
able. [67]

CIVIL ACTION commenced in the Superior Court Department on
December 21, 2000.

[1]Doing business as Genesis ElderCare.
[2]Omega, Inc., doing business as Center for Optimum Care-Winthrop.

The case was heard by *Peter W. Agnes, Jr.*, J., on a motion for summary judgment.

*Paul F. Wood* for the plaintiff.

*A. Lauren Carpenter* for the defendants.

KAFKER, J. The plaintiff, Ruthlyn Commodore, is a black woman of West Indian origin who alleged that she was unlawfully terminated from her position as director of nursing at the Center for Optimum Care-Winthrop (COC-Winthrop), a nursing home, (1) because of her race, color, and national origin; (2) in retaliation for complaining about unlawful discrimination against herself and other employees; and (3) for objecting to new patient admissions and inadequate staffing that, she said, endangered care and safety at the home.

Commodore sought relief under the antidiscrimination statutes, G. L. c. 151B and G. L. c. 93, § 102, and the health care whistleblower statute, G. L. c. 149, § 187. She brought her action against the owner and licensee of the nursing home, Omega, Inc. (Omega), and Genesis Health Ventures, Inc. (Genesis), an independent company selected to provide health care services at the facility. The trial court judge granted Commodore's motion to dismiss Genesis from her action because Genesis was involved in proceedings under Chapter 11 of the Bankruptcy Act.

Thereafter, Omega filed a motion for judgment on the pleadings under Mass.R.Civ.P. 12(c), 365 Mass. 765 (1974), on the ground that Omega was not the employer of Commodore or the other employees at COC-Winthrop. Omega based its motion primarily on the management agreement between Omega and Genesis, which Omega had attached to its answer. Commodore opposed the motion, and requested that, if the judge converted the motion into a motion for summary judgment under Mass.R. Civ.P. 56(b), 365 Mass. 824 (1974), he allow her to engage in further discovery to establish that Omega was her employer. At a hearing held five months later, Omega urged the judge to convert the motion for judgment on the pleadings to one for summary judgment. The judge allowed the summary judgment motion four months after that hearing. Commodore then filed a motion under Mass.R.Civ.P. 59(e), 365 Mass. 828 (1974), to alter or amend the judgment, claiming that she had not been

given notice of the conversion or a reasonable opportunity to present evidence. The judge denied that motion. Commodore contends on appeal that (1) the conversion of the rule 12(c) motion into a rule 56(b) motion was improper; and (2) even if it were proper, she had raised a genuine issue of material fact regarding whether Omega was her joint employer. We reverse the judge's decision allowing the motion for summary judgment.[3]

*Background.* Omega owned and was licensed to operate nursing homes in the Commonwealth.[4] Omega entered into an agreement with Genesis, a Pennsylvania-based health care management corporation, to manage COC-Winthrop and other health care facilities.

According to the management agreement, the "Manager," Genesis, would "select, employ and compensate as an operating expense . . . a licensed Facility Administrator and a Director of Nursing for the Facilities." The administrator and director of nursing would be employees of Genesis, but provide services exclusively to COC-Winthrop and other facilities owned and licensed by Omega and managed by Genesis. The agreement also provided that Genesis would "[h]ire, as employees of

---

[3]We need not resolve the propriety of the judge's conversion of the rule 12(c) motion into a motion for summary judgment without providing the parties actual notice of the conversion. Regardless of the appropriateness of that conversion, there has been no prejudice to Commodore, the party opposing the conversion, because we have concluded that summary judgment should not have been allowed. We note further that the Supreme Judicial Court has recognized that actual notice of the conversion of the motion to dismiss into a motion for summary judgment is not always required, provided the nonmovant has constructive notice of the potential conversion and an adequate time to submit factual submissions. See *White* v. *Peabody Constr. Co., Inc.,* 386 Mass. 121, 127 (1983). Nine months passed between the time Commodore filed her opposition to the motion for judgment on the pleadings, in which she argued against conversion, and the judge's decision allowing summary judgment. This provided her ample time to make factual submissions. Nevertheless, the judge could have avoided the problem by simply notifying the parties of his intentions and providing them a deadline for additional filings.

[4]Although Commodore named Omega as the owner of the COC-Winthrop facility, it was actually owned by Omega's wholly-owned subsidiary, Ohima, Inc. The parties have, however, essentially glossed over the distinction and considered it irrelevant to the questions presented in this appeal. The defendant is, therefore, referred to as Omega, as it was in the Superior Court.

[Genesis], and discharge, maintain, supervise, and relieve from its employ (as may be necessary in [Genesis's] discretion) an adequate staff of nurses." The agreement further provided that Genesis would establish employee benefits and "all personnel policies and procedures," including "rates of compensation," "hours of employment," and "job classifications." Genesis would also "cause compliance with all applicable governmental laws and regulations, specifically including the regulations pertaining to . . . non-discrimination."

The management agreement required the "Owner," Omega, to provide money to pay for capital and operating expenses, including funding the payroll account. Omega was to be consulted by Genesis on a monthly basis about operational decisions affecting the facility. Omega also had the right to inspect the facility on twenty-four hours' notice. The agreement further stated that "[Omega] shall perform those obligations and responsibilities which must be performed by the party licensed to operate the [f]acilities." As the licensee of the nursing home, Omega was required by the agreement and Department of Public Health regulations to "be responsible for compliance with all applicable laws and regulations of legally authorized agencies." 105 Code Mass. Regs. § 150.002(A)(2) (1994). In addition, the regulations provide that the licensee "shall be responsible for procurement of competent personnel, and the licensee and the administrator shall be jointly and severally responsible for the direction of such personnel and for establishing and maintaining current written personnel policies, and personnel practices and procedures that encourage good patient or resident care." 105 Code Mass. Regs. § 150.002(D) (1994).

Commodore began working at COC-Winthrop in August, 1999, as the director of nursing. She alleged in her amended complaint that, despite her superior performance, she and "other black, African and West Indian employees of COC-Winthrop/ Genesis [were] treated differently on account of [their] race, color, and national origin." She alleged that white employees at COC-Winthrop were paid at a higher rate than their black colleagues and disciplined less harshly than black employees for similar conduct. She alleged that she complained to the "COC

Winthrop/Genesis" administrator about the discrimination in July, 2000.

In May, 2000, another Omega-owned and Genesis-managed facility closed, and its patients were transferred to COC-Winthrop. Commodore alleged that her complaints to COC-Winthrop/Genesis administrators and Genesis managers about understaffing and patient overcrowding resulting from the transfer — in addition to unlawful discrimination — eventually led to the termination of her employment in August, 2000.

*Standard of review.* "[A] party moving for summary judgment in a case in which the opposing party [has] the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

1. *Joint employer status under G. L. c. 151B.*

a. It is unlawful for an "employer" or his or her agent to discriminate against an individual because of race or national origin or to retaliate against an individual for objecting to such discrimination. G. L. c. 151B, § 4(1) & (4). It is also unlawful for any person "to aid, abet, incite, compel, or coerce" such discrimination. G. L. c. 151B, § 4(5), as amended by St. 1989, c. 272, § 14. Commodore alleges (1) that there was enough evidence to create a triable issue of fact on her claim that Omega — together with Genesis — was her joint employer; and (2) that, if she established a genuine issue of material fact regarding Omega's status as a joint employer, then the judge improperly allowed summary judgment on her G. L. c. 151B claim, as well as on her G. L. c. 93, § 102, and G. L. c. 149, § 187, claims.

The seminal decision on joint employment is *Boire* v. *Greyhound Corp.*, 376 U.S. 473, 481 (1964), a case involving a bus company that had contracted with a maintenance company to service its terminals. The Supreme Court defined the concept of a "joint-employer" as a company possessing "sufficient control over the work of the employees" of another company. The Court described the joint employer determination as "essentially

a factual issue." *Ibid.* "The basis of [a joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Swallows* v. *Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997), quoting from *NLRB* v. *Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1123 (3rd Cir. 1982). See Schlei & Grossman, Employment Discrimination Law 1312 (3d ed. 1996).

Since *Boire*, Federal courts have applied joint employer principles to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 et seq., and to the Age Discrimination Employment Act of 1967, 29 U.S.C. §§ 621 et seq.[5] *Swallows, supra.* The Massachusetts Commission Against Discrimination[6] and the Commonwealth's trial courts have also applied joint employer analysis in G. L. c. 151B cases. Here, we do the same.[7]

b. Commodore argues that the requirements imposed on the licensee by 105 Code Mass. Regs. 150.002 (A)(2) and (D) were

---

[5]See, e.g., *Rivas* v. *Federacion de Asociaciones Pecunarias de Puerto Rico*, 929 F.2d 814, 820 (1st Cir. 1991) (summary judgment granted mill operator in age discrimination case because mill operator was not a joint employer even though it. "retained control over setting the time that its ships were to be unloaded, [and] may have had some work-site disciplinary authority over the [workers'] foremen"); *Sibley Memorial Hosp.* v. *Wilson*, 488 F.2d 1338 (D.C. Cir. 1973) (Title VII case involving joint responsibility for employment of health care worker). See also *Baranek* v. *Kelly*, 630 F. Supp. 1107, 1113 (D. Mass. 1986) (under Title VII, the Massachusetts Department of Elder Affairs [DEA] is an "employer" of a nonprofit corporation's employees because, due to their contractual relationship, the DEA "exercise[d] the requisite control" over the nonprofit's employment practices); *Orell* v. *UMass Memorial Med. Center, Inc.*, 203 F. Supp. 2d 52, 62-63 (D. Mass. 2002) (lists factors considered in determining joint employer status, including who supervises, hires, and fires employees and who promulgates work rules and controls assignments for employees).

[6]See *Stanley* v. *Gillete Co.*, 2 Mass. Discrimination L. Rptr. 1203, 1205 (1980), and Massachusetts Commission Against Discrimination regulation 804 Code Mass. Regs. § 3.01(1)(1995) (defining the term " 'employer' [to mean] *one or more . . .* partnerships, associations, corporations" [emphasis supplied]).

[7]In a different context, this court has applied joint employer analysis. See *Williams* v. *Westover Finishing Co., Inc.*, 24 Mass. App. Ct. 58, 60 (1987) ("[j]oint employment, where a person under the simultaneous control of two employers simultaneously performs services for both, is a well recognized phenomenon").

sufficient to raise a genuine issue of fact regarding Omega's status as a joint employer.[8] In heavily regulated environments, issues of joint employment are particularly complicated. As we noted earlier, the Department of Public Health regulation, 105 Code Mass. Regs. § 150.002(D), states, in relevant part, that the licensee "shall be responsible for procurement of competent personnel, and the licensee and the administrator shall be jointly and severally responsible for the direction of such personnel and for establishing and maintaining current written personnel policies, and personnel practices and procedures *that encourage good patient or resident care*" (emphasis supplied).

The purpose of this regulation, however, is to protect patients, not to define the employment relationships at the nursing home. The regulation does not expressly require that the licensee be the employer of the employees providing the health care. Nor does it preclude the licensee from contracting with an independent company to provide such services, as was done here. Cf. *Reida* v. *Cape Cod Hosp.*, 36 Mass. App. Ct. 553, 554 (1994) (no error in allowance of summary judgment for hospital as emergency room physician being sued for institutionalizing patient was "part of an incorporated emergency room physicians' group which provided service to hospital as an independent contractor"). The licensee's responsibility, as defined by the regulation, is to "procure," not employ, competent personnel.

Nevertheless, even if it exercises its right to contract out health care services, the licensee retains certain residual responsibilities regarding the selection and direction of health care personnel to satisfy its licensing obligation to the Department of Public Health. It also cannot contract away responsibility for the development of policies, practices, and procedures that encourage "quality" patient care.

Despite these nondelegable responsibilities, however, we do not interpret this regulation as dictating, as a matter of law, that all licensees are joint employers for the purposes of G. L. c. 151B. It is c. 151B, not the Department of Public Health's regulation, that provides the "detailed framework . . . [for]

---

[8]Commodore first raised this point in her motion to alter or amend the judgment.

employment discrimination" claims. *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 583 (1994). The regulatory requirements do not displace the multi-factor analysis of joint employer status under current antidiscrimination statutes and case law. Rather, the regulatory requirements must be integrated into that analysis.

Consideration of the regulation, the management agreement, and the other evidence contained in the record leads us to conclude that the allowance of Omega's summary judgment motion was error. Omega negotiated for the creation of the director of nursing position in the agreement. It provided the money to pay Commodore's and all other employees' salaries. Also, the extent to which Omega contracted away the employment function while still being able to fulfil its obligations as a licensee is unclear from the record. The contract language obscures the issue both by broadly delegating responsibility for the employment relationship to Genesis and leaving Omega the responsibilities required by law and regulation. Those requirements, however, preclude the contracting away of responsibility over personnel issues related to quality patient care. In this regard, the agreement is ambiguous. See *Seaco Ins. Co.* v. *Barbosa*, 435 Mass. 772, 779 (2002) ("If a contract . . . is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment . . . . Where, however, the contract . . . has terms that are ambiguous, uncertain, or equivocal in meaning," the parties' intentions may depend on disputed material facts). See also *Affiliated FM Ins. Co.* v. *Constitution Reinsurance Corp.*, 416 Mass. 839, 845-846 (1994) (summary judgment inappropriate where contract language ambiguous, and evidence of trade usage was necessary to interpret contract); *Cardone* v. *Boston Regional Med. Center, Inc.*, 60 Mass. App. Ct. 179, 186-187 (2003). Neither party has submitted evidence regarding the parties' actual application of the agreement. See Restatement (Second) of Contracts § 202 comment g, at 90 (1981) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning").

Moreover, Omega, as owner-licensee, retained in the agreement substantial financial control, as well as the right to inspection and the right to monthly consultation regarding operational

decisions.[9] However, the record reveals next to nothing about how those rights were exercised under this agreement and what their impact was on Commodore, whose high-level position as director of nursing would have involved her in decisions that would have concerned the owner-licensee of the facility as well as the manager. In sum, given Omega's contract rights, the ambiguities in the contract, the nondelegable responsibilities set by the Department of Public Health regulation, the gaps in the record, and the fact-sensitive nature of the joint employer determination, it is not correct to conclude that Commodore has no reasonable expectation of proving that Omega was a joint employer. *Kourouvacilis*, 410 Mass. at 716.

2. *General Laws c. 93, § 102, claim.* The motion judge also allowed summary judgment on the claim arising under G. L. c. 93, § 102 (also known as the Massachusetts Equal Rights Act), on the sole ground that Omega could not be liable as a joint employer. In so doing, he declined to consider whether that claim was barred by the G. L. c. 151B claim. As we have concluded that (1) summary judgment should not have been allowed at this stage on the joint employer question, and (2) neither party has briefed the issue of the interrelationship between G. L. c. 151B and G. L. c. 93, § 102, we also reverse the allowance of summary judgment on the equal rights claim. The issue whether the G. L. c. 93, § 102, claim is barred by the c. 151B claim is better considered on a fuller record after briefing.

3. *General Laws c. 149, § 187, claim.* The plaintiff also claims that Omega violated G. L. c. 149, § 187(*b*), the health care whistleblower statute, which provides as follows:

> "[A] health care facility shall not refuse to hire, terminate . . . or take any retaliatory action against a health care provider because the health care provider . . . disclose[s] to a manager . . . an activity . . . of the health care facility . . . that the health care provider reasonably believes is in violation of a law or rule or regulation . . . or [in] violation of professional standards of practice which the

---

[9]Whether Commodore and her discrimination claims were the subject of those monthly meetings is of obvious relevance to both joint employer or aiding or abetting liability under G. L. c. 151B.

health care provider reasonably believes poses a risk to
public health.''

There is no question that Commodore is a health care provider.
At issue is whether Omega is liable in these circumstances as a
health care facility. Omega successfully argued to the motion
judge that it was not a health care facility because it did not
"employ health care providers." We conclude that this statute
does not call for an analysis precisely parallel to G. L. c. 151B.
The focus of G. L. c. 149, § 187, is broader than the determina-
tion of employer status, and Omega, as owner-licensee of the
health care facility, may be held responsible for G. L. c. 149,
§ 187, violations, even if it is not a joint employer pursuant to
G. L. c. 151B.

As provided in c. 149, § 187(*a*), a "[h]ealth care facility" is
defined as follows:

> "[A]n individual, partnership, association, corporation or
> trust or any person or group of persons that employs health
> care providers, including any hospital clinic, convalescent
> or nursing home . . . or other provider of health care
> services licensed, or subject to licensing by . . . the depart-
> ment of public health; any facility as defined in section 3
> of chapter 111B;[10] any private county or municipal facil-
> ity . . . which is licensed or subject to licensing by the
> department of mental health . . . or the department of
> mental retardation; any facility as defined in section 1 of
> chapter 123[11] . . . ."

The statute is specific to the health care industry and is designed
to safeguard patient care by protecting the rights of health care
providers who expose deficiencies in care that violate laws or
regulations or professional standards that endanger public health.
The term "health care facility" in G. L. c. 149, § 187, is
directed at the facility providing the care, i.e., the hospital,
clinic, nursing home, or other health care center. The term is
broadly defined. To insure its inclusiveness, and therefore its
applicability outside the institutional setting, the definition

---

[10]"[A]ny public or private place . . . providing services especially designed
for the detoxification of intoxicated persons." G. L. c. 111B, § 3, inserted by
St. 1973, c. 1040, § 1.

[11]"[A] public or private facility for the care and treatment of mentally ill
persons. . . ." G. L. c. 123, § 1, inserted by St. 1986, c. 599, § 38.

encompasses any "individual, partnership, association, corporation, or any person or group of persons that employs health care providers."

As a nursing home, COC-Winthrop appears to be expressly covered.[12] The parties themselves, reflecting common parlance and understanding, referred to it as a health care facility in the management agreement. Omega argues, however, for limiting the definition of health care facility to the entity that employs the health care providers, even though the statutory definition (1) uses this formulation as a means of expanding, not narrowing the definition of health care facility, and (2) does not require the facilities referenced after the first semicolon "to employ health care providers" to be health care facilities, and there is no reason to distinguish these facilities from those referenced earlier.

We interpret the definition of health care facility set out in G. L. c. 149, § 187(*a*), to encompass the licensee of the health care facility. We conclude that the statutory language read as a whole supports this interpretation. It also reflects the statute's larger concerns about the quality of patient care at health care facilities and not just the employment relationships of the health care providers.

We further conclude that the requirement that the licensee be jointly and severally responsible for the direction of personnel and the establishment of policies, practices, and procedures that encourage good patient or resident care, 105 Code Mass. Regs. § 150.002(D), includes oversight responsibility for G. L. c. 149, § 187, violations at the facility. That responsibility cannot be contracted away to the entity allegedly engaged in the prohibited conduct.[13] Protection of whistleblowers is necessary to ensure quality care at the facility. This is part of the licensee's core, nondelegable patient and resident care responsibilities.

*Conclusion.* We reverse the grant of summary judgment in

---

[12]See generally G. L. c. 111, § 25B ("[h]ealth care facility" defined to include nursing home); G. L. c. 112, § 96 ("[h]ealth care facility" defined as "any hospital, nursing home, extended care facility").

[13]Cf. Prosser & Keeton, Torts § 337, at 923-924 (5th ed. 1984), discussing nondelegable duties imposed by statute.

favor of Omega on the discrimination claims brought pursuant to G. L. c. 151B and G. L. c. 93, § 102, and the whistleblowing claim brought pursuant to G. L. c. 149, § 187, and we remand for further proceedings consistent with this opinion.

*So ordered.*