SUPERIOR COURT 
 
 KYANA JINKS, ANTWIONE TAYLOR, LEE TREMBLAY, AND OTHERS,[1] INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED V. CREDICO (USA) LLC, DFW CONSULTANTS, INC., AND JASON WARD

 
 Docket:
 1784CV02731-BLS2
 
 
 Dates:
 March 31, 2020
 
 
 Present:
 Kenneth W. Salinger Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
 
 

             The Plaintiffs used to work for DFW Consultants, Inc., doing face-to-face sales for business clients of Credico (USA) LLC. DFW was run by Jason Ward.
            Plaintiffs claim that DFW and Credico were their joint employers. Kyana Jinks and Antwione Taylor claim they were misclassified as independent contractors rather than as employees. All three remaining plaintiffs, including Lee Tremblay, contend that Defendants failed to make minimum wage and overtime payments required by Massachusetts law.
            All parties have moved for full or partial summary judgment, with class certification on hold until summary judgment is decided. Credico seeks summary judgment in its favor on all claims. DFW and Ward seek partial judgment only on the overtime claim. Jinks and Taylor seek partial judgment on their claim that they were misclassified as independent contractors. All three Plaintiffs seek partial judgment declaring that Credico was their joint employer and they did not fall within the outside sales exemptions from the minimum wage and overtime statutes.
            Credico is entitled to judgment in its favor because the undisputed facts show it was not a joint employer. Plaintiffs Jinks and Taylor are entitled to judgment in their favor on their claim that DFW misclassified them as independent contractors. The minimum wage claims against DFW and Ward, which turn on
---------------------------
[1] A motion to compel arbitration was previously allowed with respect to claims by Jacqueline Sill, effectively staying Ms. Sill's claims. Claims by three other named plaintiffs —Kanika Misra, Craig Levine, and Justin Jackson—were previously dismissed with prejudice because they are barred by the doctrine of claim preclusion. The claims by Juan Melo against DFW Consultants, Inc., and Jason Ward were dismissed with prejudice by stipulation; Mr. Melo's claims against Credico were then dismissed with prejudice for failure to prosecute.
     
                                                     -1-
application of the outside sales exemption under G.L. c. 151, § 2, cannot be resolved on summary judgment because there is a material dispute as to whether Plaintiffs were required to report daily to DFW's office. But all Defendants are entitled to judgment on the overtime claims because they fell within the separate outside sales exemption under G.L. c. 151, § 1A(4).
            1. Factual Background.
            1.1. Parsing the Statement of Facts. The parties filed an extraordinarily prolix "statement of facts" that contains 277 numbered paragraphs, references 99 exhibits, and spans 142 pages. This statement was unusually difficult to navigate and use because it is filled with assertions that are not factual, facts that are not material, and allegations that are not supported by the evidence.
            The difficulty stems in part from the parties stuffing this document full of argument and quibbling. The statement contains very few direct, factual responses. The parties repeatedly assert that a factual statement is disputed without actually citing any evidence to the contrary, and generally do so as a way to introduce extraneous argument or to provide additional background information that does not actually contradict the fact asserted by the other side.
            In addition, much of the evidence that the parties discuss turns out to be immaterial. For example, Plaintiffs recount at some length evidence from a New York lawsuit regarding Credico's alleged dealings and relationship with the sales organizations involved in that case. But they make no showing that Credico followed the same practices everywhere. Nor have they presented any other evidence that Credico treated DFW the same way it allegedly dealt with contractors in other states. Credico's alleged dealings with other entities are irrelevant since Plaintiffs never link them to DFW.
            Most troubling of all is that many of Plaintiffs' factual assertions are not supported by the evidence they cite, as explained in the footnotes in the next section of this decision.
            1.2. Undisputed Material Facts. Despite the challenge of parsing the overblown and unfocused statement of facts submitted in this case, it appears that the following facts are not in dispute.
            DFW Consultants was a Massachusetts sales and marketing company; it was owned and operated by Jason Ward. For several years Credico subcontracted with DFW to provide door-to-door and other face-to-face sales services for its clients Direct Energy, Assurance Wireless, and Verizon.
                                                            - 2 -
            In February 2013, DFW and Credico entered into a "Subcontractor Agreement" in which DFW agreed to provide services for Credico clients and, in turn, Credico agreed to compensate DFW for those services. This agreement required DFW to comply, and to have its own employees comply, with Credico's code of business ethics and conduct. But it also provided that otherwise DFW "retains sole and absolute discretion, control, and judgment in the manner and means of carrying out the assignment."
            In December 2015, DFW entered into a "Services Agreement" with Credico that apparently superseded the prior contract. Once again DFW agreed to provide sales services for Credico's business clients. Credico agreed to pay DFW for that work pursuant to a fee scheduled to be established for each client in a separate "Statement of Work." This contracted provided that DFW must observe and comply with all requirements prescribed by a business client.
The Services Agreement, like the Subcontractor Agreement before it, made clear that Credico had no right to control the work performed by DFW's employees or contractors. Paragraph 4(a) provided that DFW "retains sole and absolute discretion, control, and judgment in the manner and means of carrying out the Services." Paragraph 4(b) provided that DFW would have "exclusive control over its labor and employee relations policies, and its policies relating to wages, hours, or working conditions of its employees" and "the exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, adjust grievances and discharge its employees."
            Consistent with these contractual provisions, Credico did not decide or otherwise control who DFW hired, promoted, disciplined, suspended, or fired.[2]
---------------------------
[2] Though Plaintiffs assert that Credico required DFW to implement a management training program that governed the promotion of its workers, the evidence it cites does not support that contention. For example, in the deposition testimony cited at ¶ 90 of the statement of facts, Tremblay testified that DFW provided management training for those who wanted to move up the ranks, but never contends it was mandated by Credico. In ¶ 91, Plaintiffs cite an affidavit from the New York Vasto litigation about a management training program implemented by a different sales organization working with Credico, but provide no evidence that Credico required the program or exercised any control over it, or that the training practices of that contractor were the same as those followed by DFW. In ¶ 97 Plaintiffs assert that the supposedly mandatory management training program is disseminated by Credico to all of its subcontractors, but the cited testimony merely says the sales organization owners themselves received training from Credico. Since Plaintiffs present no evidence to the contrary, Jason Ward's sworn statement that Credico had no say in whether DFW's sales staff participated in training or how their participation would affect their status within DFW is undisputed.
                                                            -3-
Nor did Credico determine where, when, or how DFW's employees or contractors did their work.[3] In addition, Credico did not play any role in determining how DFW paid its employees or contractors.[4] Though Credico established how and what it paid to DFW as commissions on sales,[5] it was up to DFW to decide how and what to pay the sales agents that worked for it.[6]
---------------------------
[3] Plaintiffs assert in ¶149 that they "were required to follow Credico standard operating procedures and requirements." But none of the evidence they cite shows that Credico imposed such requirements; the cited testimony describes procedures that DFW told Plaintiffs to follow, not procedures that Credico imposed on DFW. Since Plaintiffs have presented no evidence to the contrary, Credico's evidence that DFW had sole and absolute discretion to determine the manner and means for supplying the contracted sales services is undisputed.
[4] Though Plaintiffs assert that DFW was required to follow commission schedules imposed by Credico, they provide no evidence to support that claim. Instead, Plaintiffs have provided copies of commission schedules that appear to have been created or supplied by Assurance Wireless, Direct Energy Residential, and Verizon. See Exs. 72-75. There is no evidence as to who in fact created them, when they did so, whether the clients or Credico required DFW to follow these schedules, or whether they were in fact followed by DFW. Since Plaintiffs have presented no evidence to the contrary, Credico's evidence that DFW had exclusive control over its policies relating to pay, hours, and working conditions of its employees or contractors is undisputed.
[5] The commission schedule documents marked as Exs. 59-60 on their face govern only commissions to be paid by Credico to subcontractors like DFW. Plaintiffs have presented no evidence to support their assertion that these documents controlled what DFW paid to the Plaintiffs.
[6] Plaintiffs assert that "Jason Ward had no discretion to determine the commission his agents providing face-to-face marketing would be paid." But the only evidence they cite for this proposition is a passage in Ward's deposition transcript where he testified that sales agents were paid eight dollars for making a sale on behalf of Assurance Wireless, that Ward did not set that amount, and that Ward is not sure who did. That testimony does not establish that Ward had no discretion to set the commission amount; it is entirely consistent with Ward choosing on his own to follow a recommendation by Assurance Wireless. This testimony does not contradict Credico's explicit evidence that DFW had full discretion to decide what to pay its sales staff.
                                                            - 4 -
Credico did have procedures in place to ensure that DFW and other sales subcontractors complied with the clients' requirements for their sales representatives. Clients generally required that sales representatives undergo background checks. Many also required drug tests. And clients also required that their code of conduct and other specified documents or information be provided to every new sales representatives.
            Credico imposed so-called "onboarding" procedures to ensure that all such client requirements were satisfied, and that such compliance was properly documented each time a new sales representative started to work for that client.
            But Credico did not generate or maintain any other employment records for DFW's sales staff; for example it did not maintain payroll records, IRS Forms W-2 or 1099, or any other information regarding agent compensation.
            Kyanna Jinks, Antwione Taylor, and Lee Tremblay were all hired by DFW to do face-to-face marketing work for Credico's clients. Jinks worked for DFW from September 2014 to January 2015 on the Assurance Wireless and Verizon campaigns and was classified as an independent contractor. Taylor worked for DFW from October 2014 to December 2015 on the Assurance Wireless and Direct Energy campaigns and was also classified as an independent contractor. Tremblay worked for DFW from October to December 2016 on the Direct Energy campaign and was classified as an employee.
            Credico paid DFW for the services it provided, and DFW in turn paid Jinks, Taylor, and Tremblay commissions based on sales they made. None of the plaintiffs received any compensation directly from Credico.
            Jinks, Taylor, and Tremblay performed their sales work in the field, not in any DFW office or facility. They did all of their sales work in the field, soliciting potential customers through face-to-face interactions. Plaintiffs have presented evidence that they were generally required to meetings at DFW at the start and end of the work day. DFW has presented conflicting evidence and contends that Plaintiffs were generally not required to report to the DFW office.
---------------------------
[2]. Credico as Joint Employer. The Court concludes that joint employers can both be held liable under the wage act and overtime statute, that the "right to control" test determines whether more than one company is a joint employer, and that Credico is entitled to summary judgment because it had no right to control the work of and therefore was not a joint employer of the Plaintiffs.
                                                            -5-
            2.1. Joint Employment under Wage Statutes. Two businesses that obtain services from and control the work of the same employee may share joint liability under the wage act and overtime statute. So if Credico and DFW were joint employers of the Plaintiffs, they would share responsibility and liability for any failure to pay required wages, whether resulting from misclassification of an employee as an independent contractor or from simple underpayment of wages owed to someone treated as an employee.
            Credico argues that the minimum wage and overtime statute by their terms contemplate that each employee has only a single employer. It notes that G.L. c. 151, § 1, makes it unlawful for "any employer" to pay less than the prescribed minimum wage, and that G.L. c. 151, § 1A, provides that "no employer" shall employ anyone for more than 40 hours per week without paying overtime. Credico contends that the phrases "any employer" and "no employer" are singular and thus preclude holding more than one entity jointly liable.
            This assertion—that two businesses could never, under any circumstances, be treated as joint employers sharing liability under these statutes—has no merit.
            "Joint employment, where a person under the simultaneous control of two employers simultaneously performs services for both, is a well-recognized phenomenon," and results in both employers being liable under statutory requirements imposed to protect workers. See Case of Whitman, 80 Mass. App. Ct. 348, 355 (2011) (applying Workers' Compensation Act), quoting Williams v. Westover Finishing Co., 24 Mass. App. Ct. 58, 60 (1987); accord Commodore v. Genesis Health Ventures, Inc., 63 Mass. App. Ct. 57, 62 (2005) (applying joint employer analysis to employment discrimination claim under G.L. c. 151B).
            The workers' compensation act, unlike the wage act or the overtime statute, expressly provides that two employers that concurrently employee the same worker may be liable under that statute. See G.L. c. 152, § 26B.
            But the Appeals Court has assumed, without expressly deciding, that two entities can similarly both be liable to a single employee as joint employers under the Wage Act or the overtime statute. See Gallagher v. Cerebral Palsy of Massachusetts, Inc., 92 Mass. App. Ct. 207, 214 (2017).
            This makes good sense, as there is nothing in either statute that supplants or bars application of the common law status of joint employment. Cf. Chelsea Housing Auth. v. McLaughlin, 482 Mass. 579, 590 (2019) (statute should not be
                                                            - 6 -
interpreted as making material change in the common law unless intent to do so is clearly expressed, either explicitly or by necessary implication).
            The phrase "any employer" is not by definition limited to a single employer; rather, when a noun is modified by the word "any" the phrase is best understood as being applicable "to more than one individual object." See President and Fellows of Harvard College v. PECO Energy Co., 57 Mass. App. Ct. 888, 892 (2003), quoting Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Chatham, 404 Mass. 365; 368 (1989). Similarly, the statutory provision that "no employer" may fail to pay overtime to employees who work more than 40 hours in a week does not exclude the possibility that two joint employers may both be liable for violating the statute.
            The Appeals Court has recognized that joint employment may exist and lead to joint liability under statutes that make it unlawful for "an employer" or "any employer" to engage in prohibited conduct. By statute, it is unlawful for "an employer" to discriminate against an employee based on their race, sex, gender identity, or other prohibited reasons. See G.L. c. 151B, § 4(1). It is similarly unlawful for "any person [or] employer" to retaliate against someone for objecting to such discrimination. Id. § 4(4). Although these statutes use the singular form of "employer," both may be applied against more than one joint employer. See Commodore, 63 Mass. App. Ct. at 61-62.
            This is consistent with the rule that singular terms in statutes generally encompass the plural. The Legislature has directed that, when construing provisions in the general laws, singular nouns "may extend and be applied to several persons or things." See G.L. c. 4, § 6, cl. Fourth. The Supreme Judicial Court reads this provision as requiring that a singular term in a statute should be read as encompassing the plural where doing so "is necessary to carry out the evident intent of the statute." Leopoldstadt, Inc. v. Comm 'r of Div. of Health Care Fin. & Policy, 436 Mass. 80, 87 (2002), quoting Blue Cross of Mass., Inc. v. Commissioner of Ins., 397 Mass. 674, 679 (1986).
            Reading the wage statutes as applying to more than one joint employer is necessary to achieve the clear purpose of those laws. The purpose of the wage act and overtime statute is to protect employees' right to timely wages that satisfy certain minimum requirements. See, e.g., Parker v. EnerNOC, Inc., 484 Mass. 128, 132 (2020). Given this remedial purpose, both statutes should be broadly construed to protect employees. See, e.g., Arias-Villano v. Chang & Sons Enterprises, Inc., 481 Mass. 625, 628 (2019).
                                                            - 7 -
            2.2. The Test for Joint Employment. Neither the wage act nor the overtime statute defines "employer" or specifies the circumstances in which two companies will constitute joint employers of the same employee. See Gallagher, 92 Mass. App. Ct. at 210 & 214.
            At common law, under the so-called "right to control" test, a company that has "sufficient control over the work of the employees' of another company" is deemed to be the joint employer of those employees. Id. at 214, quoting Commodore, 63 Mass. App. Ct. at 61, and Boire v. Greyhound Corp., 376 U.S. 473, 481 (1964); accord Silvia v. Woodhouse, 356 Mass. 119, 124 (1969) ("In general the existence of a master-servant [i.e. employer-employee] relationship depends on whether there is a right to control").
            Plaintiffs contend that when applying the wage statutes this common law test has been supplanted by the statutory test for determining whether someone who provides services to another is an employee or an independent contractor. The Court disagrees. The test adopted in the independent contractor statute does not determine whether someone who is the employee of one company is also the joint employee of another.
            Under the independent contractor statute, "an individual performing any service, ... shall be considered to be an employee" for the purposes of chapters 149 and 151 of the General Laws unless the entity to which the person is providing service can prove that:
(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
(2) the service is performed outside the usual course of the business of the employer; and,
(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.
G.L. c. 149, § 148B.
            Section 148B "establishes a standard to determine whether an individual performing services for another shall be deemed an employee or an independent contractor for purposes of our wage statutes." Somers v. Converged Access, Inc., 454 Mass. 582, 589 (2009). This same statutory test applies to resolve a similar issue arising under the unemployment insurance statute: whether
                                                            - 8 -
there is an employment or an independent contractor relationship between a worker and the business to which they provide services. See Coverall North America, Inc. v. Commissioner of Div. of Unemp. Assistance, 447 Mass. 852, 856857 (2006); G.L. c. 151A, § 2. In either context this three-part test has come to be known as the "ABC test." See Coverall North Amer., supra.
            The Supreme Judicial Court has made clear that § 148B "has no application where the parties have neither an independent contractor nor an employment relationship." Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 329 (2015), quoting Depianti v. Jan-Pro Franchising Int'l, Inc., 465 Mass. 607, 624 n.17 (2013).
            The ABC test is only useful "to resolve whether a worker has been properly classified as an independent contractor or employee;" it "does not fit analytically with and was not intended to apply to claims of joint employer liability." Henderson v. Equilon Enterprises, LLC, 253 Cal.Rptr.3d 738, 750 (Cal. Ct. App. 1st Dist. 2019); accord Curry v. Equilon Enterprises, LLC, 233 Cal.Rptr.3d 295, 314 (Cal. Ct. App. 4th Dist. 2018); Salazar v. McDonald's Corp., 944 F.3d 1024, 1032 (9th Cir. 2019) (applying California law); Perez v. Access Bio, Inc., no. A-3071-16RT4, 2019 WL 3297297 (N.J. Sup. Ct. App. Div. July 23, 2019); Echavarria v. Williams Sonoma, Inc., civ. no. 15-6441, 2016 WL 3566986, at *2—*3 (D.N.J. June 30, 2016) (applying New Jersey law).
            By its terms, the ABC test only applies where the worker provided services to the alleged employer. This is a "threshold question," meaning that § 148B does not apply where the plaintiff worker did not "provide[] services to the defendant." See Gallagher, 92 Mass. App. Ct. at 210, quoting Sebago, 471 Mass. at 329. "If this threshold is met, the individual is presumed to be an employee" unless the putative employer proves that all three prongs of the ABC test are met and thus "that the person worked as an independent contractor." Id.
            Since § 148B applies only where a worker provides services directly to a potential employer, it does not apply where there is no such work arrangement between the parties. See Depianti, 465 Mass. at 626 (Cordy, J., dissenting in part). That a company obtains some indirect economic benefit as a result of work performed by an individual for someone else is not sufficient to implicate § 148B and impose a presumption that there is an employment relationship between them. See Sebago, 471 Mass. at 329; Depianti, 465 Mass. at 624 n.17.
            The SJC has explained the point this way. If "company A contracts with company B for services," which prompts company B to hire people "to perform the work it undertook under its contract with company A," ordinarily § 148B
                                                            - 9 -
would only to the relationship between the workers and company B. Depianti, supra, at 624 n.17; accord id. at 626 (Cordy, J.). "[C]ompany A would not be liable for misclassification of the third-party workers" because "company B would be the agent of any misclassification." Id. n.17; accord Echavarria, 2016 WL 3566986, at *2 ("It is illogical to hold a defendant liable for an employee's misclassification under the ABC test if a defendant only had a tangential relationship to a plaintiff.").
            This does not mean that a company can avoid misclassification liability by contracting to obtain services from workers through an intermediary. Where a business arranges for a particular person to provide services to it and to no one else, the business may be liable under the wage statutes as an employer even if it contracts with an intermediary corporate entity that in turn contracts with the employee. See Chambers v. RDI Logistics, Inc., 476 Mass. 95, 108-109 (2016); Depianti, 465 Mass. at 623-624 & n.17; Weiss v. Loomis, Sayles & Company, Inc., 97 Mass. App. Ct. 1, 6-7 (2020).
            But the undisputed facts of this case mirror the hypothetical discussed by the SJC in Depianti footnote 17. Credico never had any work arrangement with the Plaintiffs. Instead, Credico subcontracted with DFW to provide face-to-face sales services for Credico's business clients, and in turn DFW hired the Plaintiffs and other sales representatives to perform the work it promised to do for Credico.
            Under these circumstances, Plaintiffs cannot be said to have provided services to Credico, the test imposed by § 148B does not apply, and whether Credico is liable to Plaintiffs as their employer or joint employer must be decided by applying the common law "right to control" test.
            2.3. Applying the Right to Control Test. So to establish they were jointly employed not only by DFW but also by Credico, the Plaintiffs must show that Credico had the right to control their work. See Gallagher, 92 Mass. App. Ct. at 214. They need not show that Credico exercised actual control over their work, only that it had the right to do so. Id. at n.15; accord, e.g., Cowan v. Eastern Racing Ass'n, 330 Mass. 135, 141 (1953).
            Since the Massachusetts wage statutes do not define "employer," see Gallagher, 92 Mass. App. Ct. at 210 & 214, it is appropriate to look to interpretations of the analogous Federal Fair Labor Standards Act for guidance as to how to apply the right to control test and decide whether Credico was Plaintiffs' joint
                                                            - 10 -
employer. See Goodrow v. Lane Bryant, Inc., 432 Mass. 165, 170 (2000); see also Mullally v. Waste Mgmt. of Mass., Inc., 452 Mass. 526, 531 (2008) (Massachusetts overtime statute, G.L. c. 151, § 1A, was indented to be "essentially identical" to FLSA, and thus construction of FLSA by Federal courts is relevant).
            To determine whether an employment relationship exists for purposes of the FLSA, courts "must look to the totality of the circumstances, including whether the alleged employer: (1) had the power to hire and fire the employee, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Romero v. Clean Harbors Surface Rentals USA, Inc., 368 F.Supp.3d 152, 159 (D.Mass. 2019) (Saris, C.J.), paraphrasing Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir.1998).
            This test "is applied to each putative employer individually," whether the worker is suing one alleged employer or more than one alleged joint employers. Romero, supra.
            The summary judgment record makes clear that Plaintiffs cannot prove Credico was their joint employer. It demonstrates that Credico had no power to hire or fire DFW's workers, did not supervise or control their work schedules or other conditions of employment, did not and had no power to establish the rate or method for paying DFW's workers, and did not maintain employment records for those workers. Nor have Plaintiffs mustered any other evidence that Credico had the right to control Plaintiffs' work for DFW.[7]
            As discussed above, in § 1.2 of this decision, Plaintiffs' contentions as to Credico's purported exercise of control over the pay and work conditions of DFW's employees are not supported by the evidence that Plaintiffs' cite.
            These contentions therefore carry no weight and must be disregarded. A party cannot avoid or obtain summary judgment by making factual assertions without evidence to back them up. See, e.g., Chang v. Winklevoss, 95 Mass. App. Ct. 202, 214, rev. denied, 482 Mass. 1105 (2019) (court may not credit factual
---------------------------
[7] A federal district court has found, on similar records in two different actions, that Credico does not control and therefore is not the joint employer of sales people hired by other contractors to work for Credico's clients. See Vasto v. Credico (USA) LLC, No. 15 Civ. 9298 (PAE), 2017 WL 4877424, *8—*16 (S.D.N.Y. Oct. 27, 2017) (granting summary judgment for Credico), aff'd on other grounds, 767 Fed.Appx. 54 (2d Cir. 2019); Martin v. Sprint United Mgmt. Co., No. 15 CV 5237 (PAE), 273 F.Supp.3d 404, 434-439 (S.D.N.Y. Sept. 27, 2017).
                                                            -11-
assertions "not supported by the summary judgment record"); Bergendahl v. Massachusetts Elec. Co., 45 Mass. App. Ct. 715, 718-719, rev. denied, 428 Mass. 1111 (1998), cert. denied, 528 U.S. 929 (1999) ("mere assertions of the existence of disputed facts without evidentiary support cannot defeat [a] summary judgment motion").
            Since Credico is not the Plaintiffs' joint employer, it cannot be liable for misclassifying any of them as independent contractors or failing to pay any of them minimum wage and overtime payments required by Massachusetts law. Credico is therefore entitled to summary judgment in its favor on all claims.
            3. Misclassification by the DFW Defendants. Plaintiffs Jinks and Taylor are entitled to summary judgment in their favor on the misclassification claims against DFW and Jason Ward. DFW is liable for misclassifying Jinks and Taylor as independent contractors when in fact they were employees, in violation of G.L. c. 149, § 148B. Jason Ward is personally liable for this misclassification because was in charge of managing the corporation. See § 148B(d).
            Although DFW and Ward contend that all the Plaintiffs were covered by the outside sales exemptions to the minimum wage and overtime statutes, an issue discussed separately below, they do not dispute that Jinks and Taylor were misclassified. That makes good sense, as the undisputed facts establish that Jinks and Taylor should have been classified and treated as employees of DFW.
            There is no dispute that both Jinks and Taylor provided services directly to DFW. They were hired by DFW to engage in face-to-face sales efforts on behalf of specified clients. They did the jobs they were hired to do, provided the services that DFW asked them to provide, and were paid by DFW for that work.
            Given these facts, by law Jinks and Taylor were presumed to be DFW employees under G.L. c. 149, § 148B(a). DFW and Ward cannot rebut that presumption because they cannot show that the services performed by Jinks or Taylor were outside DFW's usual course of business. See id., § 148B(a)(2). The kind of sales services provided by Jinks and Taylor were not merely incidental to the business, but instead were the very essence of DFW's entire business; they were therefore part and parcel of its usual course of business. See Weiss, 97 Mass. App. Ct. at 8-9; Carey v. Gatehouse Media Mass. I, Inc., 92 Mass. App. Ct. 801, 807-808 (2018). Jinks and Taylor are therefore entitled to summary judgment in their favor on this claim. See Carey, supra (affirming summary judgment for plaintiff employees).
                                                            - 12 -
            4. Outside Sales Exemptions.
            4.1. Exemption from Minimum Wage under § 2. The minimum wage claim against DFW and Ward turns, at least in part, on whether Plaintiffs fell within the outside sales exemption provided in G.L. c. 151, § 2. That issue cannot be resolved on summary judgment because material facts are in dispute.
            By law, employers must pay a minimum wage to any employee who works in an "occupation" as that term is defined in the statute. See G.L. c. 151, § 1.
            The statutory definition of "occupation" excludes "outside sales work regularly performed by outside salesmen who regularly sell a product or products away from the employer's place of business and who do not make daily reports or visits to the office or plant of their employer." See G.L. c. 151, § 2.
            The first prong of this test is satisfied here. It is undisputed that all three remaining Plaintiffs regularly made sales away from DFW's place of business. That is how they spent their workday.
            However, there is a material dispute as to whether the second prong of this exemption test is satisfied here. DFW and Ward have presented evidence suggesting that Plaintiffs did not have to and did not make daily reports or visits to DFW's office. But Plaintiffs have presented conflicting evidence, which a reasonable fact finder might credit at trial, suggesting that Plaintiffs did indeed report daily to DFW.
            As a result, whether the § 2 exemption for outside salespeople applies in this case cannot be resolved on a motion for summary judgment.
            4.2. Exemption from Overtime under § 1A. In contrast, DFW and Ward are entitled to summary judgment in their favor on the overtime claim. It is undisputed that Plaintiffs worked for DFW as outside sales people. The outside sales exception in G.L. c. 151, § 1A, therefore applies, whether or not Plaintiffs had to report daily to DFW's office. (If there were a triable issue as to whether Credico was Plaintiffs' joint employer, which there is not, Credico would be entitled to summary judgment on the overtime claim for the same reasons.)
            Under the overtime statute, employers must pay overtime to any employee who works in an "occupation" for more than forty hours per week; the overtime must be at least 1.5 times the employee's regular wage. See G.L. c. 151, § 1A. Since this obligation only applies to employees working in an "occupation," if an employee falls within the outside sales exception in § 2 —
                                                            - 13 -
meaning they regularly makes sales outside the employer's place of business, and in addition do not report daily to the employer's office or plant—then the overtime statute does not apply.
            Separate and apart from the statutory definition of "occupation," the overtime statute also contains its own list of twenty additional exceptions. One of them states that the overtime statute "shall not be applicable to any employee who is employed ... as an outside salesman or outside buyer." G.L. c. 151A, § 1A(4).
            Significantly, the outside sales exception in § 1A(4) says nothing about daily reports. Unlike the § 2 exception, by its plain terms § 1A(4) covers outside salespeople and outside buyers whether or not they report daily to the office.
            Plaintiffs argue that the outside sales exception in § 1A(4) is identical to the one in § 2, and should be read as including the same limitation of no daily reporting. Plaintiffs' position is unavailing for several reasons.
            First, that is not what the overtime statute says. The § 1A(4) exception says nothing about daily reports. Nor does it incorporate by reference the materially different language found in the § 2 outside sales exception. The Court may "not read into the statute a provision which the Legislature did not see fit to put there, whether the omission came from inadvertence or of set purpose." City Elec. Supply Co. v. Arch Ins. Co., 481 Mass. 784, 789 (2019), quoting General Elec. Co. v. Department of Envtl. Prot., 429 Mass. 798, 803 (1999).
            Second, the Court may not ignore the Legislature's choice to limit the § 2 outside sales exception to employees who do not make daily reports to the office, but not to include or incorporate that limitation in § 1A(4). "Where the Legislature used different language in different paragraphs of the same statute, it intended different meanings." Gint her v. Commissioner of Insurance, 427 Mass. 319, 324 (1998); accord Tamulevich v. Robie, 426 Mass. 712, 713-714 (1998). Thus, "if specific language appears in one section of a statute and is absent from a related section, the absent language should not be read into the provision from which it is missing." Tilcon Massachusetts, Inc. v. Commissioner of Revenue, 30 Mass. App. Ct. 264, 269 (1991); accord, e.g., City Elec. Supply, 481 Mass. at 789; Beeler v. Downey, 387 Mass. 609, 616 (1982).
            Third, reading the § 1A(4) outside sales exception as simply repeating the § 2 outside sales exception would make the former provision superfluous. There was no need for the Legislature to add an outside sales exception to § 1A that perfectly mirrors the occupation exception in § 2, because the § 2 definition of
                                                            - 14 -
"occupation" already governs § 1A. It would be improper to read §1A(4) in the way suggested by Plaintiffs because that would make the outside sales exception in the overtime statute redundant and superfluous. See Shirley Wayside Ltd. Partnership v. Board of Appeals of Shirley, 461 Mass. 469, 477 (2012) (courts should "interpret a statute to give effect to all its provisions, so that no part will be inoperative or superfluous") (quoting Connors v. Annino, 460 Mass. 790, 796 (2011) (internal quotation marks omitted)).
            Plaintiffs' invocation of a December 2002 opinion letter by a legal counsel working for the Department of Labor is also unavailing. The Court will assume without deciding that this constitutes an official opinion by the Department,[8] and that the letter can be read as opinion that the outside sales exemption in § 1A(4) incorporates the "no daily reports" condition of the outside sales exemption in § 2. Nonetheless, this letter is entitled to no deference because it is inconsistent with the statutory text, for the reasons discussed above. See Swift v. AutoZone, Inc., 441 Mass. 443, 450 (2004) (declining to defer to Department opinion letter concluding that employers may credit Sunday premium payments toward overtime pay); Youssefi v. Direct Energy Business, LLC, Suffolk Sup. Ct. no. 1884CV03809-BLS1, slip op. at 4 n.4 (Mass. Sup. Ct. Feb. 28, 2020) (Green, J.) (declining to defer to Department's December 2002 opinion letter because it is inconsistent with plain language of § 1A(4) exemption and would render that provision superfluous).
---------------------------
[8] Opinion letters by agency staff regarding the meaning of a statute that do not constitute an adjudicatory decision or other official agency action are not entitled to special deference. See Christenson v. Harris County, 529 U.S. 576, 585587 (2000) (declining to defer to opinion letter by Department of Labor construing federal Fair Labor Standards Act); accord Ten Local Citizen Group v. New England Wind, LLC, 457 Mass. 222, 228 (2010) (though agency delegated responsibility for adjudicatory hearing to division of administrative law appeals, interpretation of regulation in magistrate's recommended final decision was entitled to no deference).
That follows from the general rule that a court should only defer to a statutory or regulatory interpretation that was "actually made by the agency" and adopted as its "authoritative" or "official position;" it is inappropriate to defer to a "more ad hoc statement" by agency staff. Kisor v. Wilkie, 139 S. Ct. 2400, 2416 (2019) (explaining limits on deference to agency's interpretation of its own regulation).
                                                            - 15 -
ORDER
            The motion by defendant Credico (USA) LLC for summary judgment in its favor on all claims is ALLOWED. The motion by defendants DFW Consultants, Inc., and Jason Ward for partial summary judgment in their favor on the claims for overtime pay in Count IV of the third amended complaint is ALLOWED. Plaintiffs' cross-motion for partial summary judgment in their favor on certain claims or issues is ALLOWED IN PART as to the misclassification claim against DFW Consultants and Jason Ward in Count I but DENIED IN PART as to the other issues raised in the motion.
            The parties shall promptly confer about and submit a proposed schedule for the service and filing of any motion for class certification on the minimum wage claim against DFW Consultants and Mr. Ward. The parties shall also promptly file a status report about the mandatory arbitration of Jacqueline Sill's claims.
@/s/Kenneth W. Salinger Justice of the Superior Court
@March 31, 2020
                                                            -16-
xxz